UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

ROBERT COOPER, *et al.*,                          *
                                                  *
      Plaintiffs,                          *        Case No.: 4:17-cv-116 (CDL)
                                                  *
v.                                                *
                                                  *
PARKER PROMOTIONS, INC., *et al.*,                *
                                                  *
      Defendants.                          *

## DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

**COME NOW**, Defendants Parker Promotions, Inc. and Nicholas Parker ("Defendants"), filing this Brief in Support of Motion for Summary Judgment showing as follows:

## INTRODUCTION

This is a Fair Labor Standards Act ("FLSA") classification and overtime case involving nightclub Club Fetish for 2014 to 2017. Plaintiffs Dowdell, Goodine, Mathews and Sykes contend that they should receive hourly wages and overtime payments for dancing at the club, while Cooper contends that he is entitled to overtime compensation. As set forth herein, Plaintiffs fail to show that the FLSA covered Defendants for multiple years in question, so Defendants are entitled to summary judgment on this and other grounds.

## STATEMENT OF FACTS

Defendants incorporate their Statement of Material Facts filed concurrently herewith, and develop the facts more specifically as necessary herein. Overall, according to spreadsheets generated by Plaintiffs' attorneys for initial disclosures and not in issue for this motion, Cooper claims that he worked 58.5 total hours a week from June 1, 2014 to May 28, 2017, working that

same amount every week with no gaps, working a total of 18.5 overtime hours every week, and that he was paid $100 per day regardless of the number of hours he worked.

Dowdell claims she worked 60 hours a week as a dancer from May 29, 2016 through July 2016, and that from October 2016 through the week of February 19, 2017 she worked 36 hours a week. Goodine claims she worked 30 hours a week as a dancer from May through September 2016. Mathews claims she worked as a dancer for 48 hours a week from June 1, 2014 through the week of April 26, 2015, and that from May 3, 2015 to May 28, 2017 she worked 36 hours a week. Sykes claims she worked 48 hours a week as a dancer from 2015 through May 28, 2017.

## SUMMARY JUDGMENT STANDARD

A defendant is entitled summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a). The moving party bears the burden of proving that no genuine issue of material fact exists. *Id*. A factual dispute is genuine if the evidence would allow a reasonable jury to find for the nonmoving party. *Anderson v. Liberty Lobby, Inc*, 477 U.S. 242, 248 (1986). A fact is material if it is "a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc*., 121 F.3d 642, 646 (11th Cir. 1997).

## ARGUMENT AND CITATION TO AUTHORITY

The FLSA requires covered businesses to pay a minimum hourly wage to their "employees" but not to independent contractors. 29 U.S.C. § 206(a). The FLSA also requires overtime compensation at time-and-a-half to employees working over forty hours a week. 29 U.S.C. § 207(a)(1). But Plaintiffs' claims here fail because they do not show they were covered by the FLSA in 2014, 2015, or 2016, and because the dancers Plaintiffs were not "employees."

I.      **Plaintiffs Fail to Demonstrate FLSA Coverage**

Prior to determining if there are fact issues for a jury to decide here, it must be determined whether there is sufficient evidence for a jury to find that Parker Promotions was subject to the requirements of the FLSA in the pertinent compensable years. An FLSA plaintiff can demonstrate FLSA coverage under (1) enterprise coverage for each compensable year in question, which deals with the revenues of the business for that year, or (2) individual coverage, which applies when the plaintiff routinely engaged in interstate commerce.

*No Enterprise Coverage for 2014, 2015, and 2016*

To fall under FLSA enterprise coverage, a business must have (1) employees engaged in commerce or handling goods moved in commerce, and (2) annual gross volume of sales or business "not less than $500,000" for the relevant year. 29 U.S.C. § 203(s); 29 U.S.C. § 207(a)(1); 29 U.S.C. § 209(s)(1)(A). *Collar v. Abalux, Inc.*, 895 F.3d 1278, 1281-82 (11th Cir. 2018). *See also Josendis v. Wall to Wall Residence Repairs, Inc*., 662 F.3d 1292, 1317 (11th Cir. 2011); This is Plaintiffs' burden – Defendants are not required to *prove* their exact revenues or, for instance, establish that their books were audited and maintained in accordance with strict accounting principles. *See, e.g., Hajiani v. Perseus Invs., LLC*, No. 1:11-CV-3504-TWT, 2012 WL 3241713, at *3 (N.D. Ga. Aug. 6, 2012) (defendant failed to demonstrate enterprise coverage by citing "sporadic estimates" of sales and conjecture of overall revenues based on his own limited knowledge of the sales).

The revenues here are facially insufficient to create coverage under the FLSA, and well below the sales to push Parker Promotions to the $500,000 threshold for enterprise coverage. And "an enterprise's total gross volume sales of business done may be determined from its tax returns." *Flores v. Nuvoc, Inc.,* 610 F. Supp. 2d 1349 1355-56 (S.D. Fla. 2008) (collecting cases),

aff'd sub nom. *Polycarpe v. E & S Landscaping Service, Inc.*, 616 F.3d 1217, 1229 (11th Cir. 2010). *See also* 29 C.F.R. § 779.266 ("No computations of annual gross dollar volume are necessary to determine coverage or exemption in those enterprises in which the gross receipts regularly derived each year from the business are known by the employers to be substantially in excess or substantially under the minimum dollar volume specified [in the FLSA]").

Parker Promotions has produced tax returns reflecting revenues of $302,557 for 2014, $268,577 for 2015, and $214,263 for 2016. (Parker Dep. 109:12-116:14 & Pls.' Dep. Ex. 49 (Ex. J, attached); Oakes Dep. 97:22-100:10; Hanson Aug. 1 Dep. 43:5-12.) Plaintiffs deposed Master Tax Solutions, Inc., Parker Promotions' bookkeeper and tax preparer, which testified that they prepared the returns based on the club's sales, and Plaintiffs inquired about additional sales at the club and club records reflecting door fees (*see, e.g.,* Oakes Dep. 94:7-13, 100:22-101:16), but are unable to carry their burden past the requisite threshold.

Plaintiffs conceded that they are not familiar with the finances of Parker Promotions (Cooper Dep. 97:17-98:5; Dowdell Dep. 89:9-15; Goodine Dep. 55:3-6; Mathews Dep. 113:22-25), and as a result they have nothing to add from their personal knowledge to attempt to cross the $500,000 threshold for any of these years.  In *Hernandez v. Nanju Corp.*, 2008 WL 1925263, at *3 (S.D. Fla. Apr. 30, 2008), for instance, the plaintiff cook "had no personal knowledge of actual revenue taken in by [FLSA defendant]." He could speak of the food he prepared, but lacked "knowledge or experience with the financial practices of the business." His "speculative beliefs in attempting to contradict Defendants' affidavit and tax returns" failed to demonstrate enterprise coverage. *See also Li v. Zhao*, 35 F. Supp. 3d 300, 306 (E.D. N.Y. 2014) ("It is not enough for [plaintiff] to argue that the tax returns did not credibly report the restaurant's gross

sales, when considered alongside its costs, without furnishing concrete and affirmative evidence to support the conclusion that the restaurant's gross sales were more than $500,000 every year").

Plaintiffs went to great lengths to discover, explore and attack the revenues and accounting of Parker Promotions, deposed its bookkeeper, and have been able to discover substantial evidence about cash payments and revenues of the business. To survive summary judgment they must demonstrate that they meet the $500,000 annual threshold and not simply resort to complaints or accusations about the company's reporting and recordkeeping. *Thongsodchareondee v. King Kone Food, Inc.*, 2011 WL 2976933 at *3 (S.D. Fla., July 21, 2011) (granting summary judgment and rejecting plaintiff's arguments about "discrepancies" in finances where "Plaintiff has adduced no evidence to support a finding of enterprise coverage under the FLSA [and] submitted no evidence … that would support a determination …[of] an annual gross volume of sales made or business done in excess of $500,000"). They fail to do so and because Plaintiffs do not show that Parker Promotions is covered by the FLSA, Defendants are entitled to summary judgment for years 2014 through 2016.

Plaintiffs cited *McBride v. T & A of Citrus Cty., Inc.* No. 5:13-cv-18-Oc-22PRL, 2014 WL 12589352 at *3-5 (M.D. Fla. June 24, 2014) in their Response to Defendants' Motion for Protective Order. (ECF No. 31 at n.21.)   This magistrate recommendation is factually distinguishable because the annual revenues reported in that case ($551,859, $492,726, and $466,028) were far higher than those here.. The *pro se* defendant restaurant in *McBride* actually had revenues greater than $500,000 in a preceding year in question. Additionally, the plaintiff was lead cook and responsible for catering orders, had personal knowledge to testify about additional overall monthly and annual revenues brought in from catering, and this testimony was non-speculative and apparently unchallenged. *McBride* at *1-2, 4. Faced with revenues of a

5

preceding year exceeding $500,000, reported revenues in following years that were very close to the threshold, testimony about large amounts of employees paid under the table (records of cash income which, unlike here, were apparently not made available to plaintiff), and plaintiff's testimony and personal knowledge about cash sales to cross the threshold, the recommendation in that case was to deny summary judgment. *Id.* at \*4-5. But these facts are not present here, of course. Because Plaintiffs' claims against Nicholas Parker are derivative to that of Parker Promotions, it follows that Parker is individually entitled to summary judgment on this ground.

*No Individual Coverage*

To be individually covered under the FLSA, an employee must "*regularly* [use] the instrumentalities of interstate commerce in his work, e.g., regular and recurrent use of interstate telephone, telegraph, mails, or travel." *Thorne v. All Restoration Svcs., Inc.* 448 F.3d 1264, 1266 (11th Cir. 2006) (emphasis added) (noting distinction between goods traveling across state lines and employees engaged with intrastate movement of goods that have already reached "the customer for whom they were intended") (citing *McLeod v. Threlkeld*, 319 U.S. 491, 493-98 (1943)). 29 U.S.C. § 206(a), 29 U.S.C. § 207(a)(1).

The dancer Plaintiffs–Mathews, Dowdell, Goodine, and Sykes–all agreed that their conduct at the club involved strictly dancing; they did not regularly serve alcohol, for instance, or engage in other conduct that would constitute behavior so as to subject Parker Promotions to individual coverage under FLSA. (Dowdell Dep. 89:16-21; Goodine Dep. 55:10-15; Mathews Dep. 114:8-14; Sykes Dep. 12:25-13:2.) This is clearly insufficient to lead to individual coverage. *Josendis*, 662 F.3d at 1316-17.

And while Cooper claimed that he also worked as a "barback," in addition to working security and working the front door (Cooper Dep. 98:6-99:6), his testimony made clear that this

conduct was only occasionally performed by him, as opposed to the consistent, routine, *regular* involvement required by the FLSA for individual coverage under *Thorne*. Cooper testified that

> [i]t was just – it was whenever they needed – had – had the need for it. It wasn't a specific, Hey, these four nights, you're going to be a barback. It wasn't – it wasn't like that. If the barback wasn't there, hey didn't have anybody, I would go to the store, get ice, bring it back, load up the chests, fix the bottles that- that sort of things.

(Cooper Dep. 99:3-9.) Assuming, without conceding, that Cooper even worked occasionally with alcohol, his testimony does not show that he did so on an *interstate* basis, and his conduct was only "sporadic involvement" insufficient to create FLSA coverage. *Thorne*, 448 F.3d at 1266.  At the very most, the Plaintiffs were simply engaged in intrastate commerce.  *Navarro v. Broney Auto Repairs, Inc.*, 314 F. App'x 179, 180 (11th Cir. 2008) (installing motor parts into foreign and domestic vehicles an intrastate activity); *Scott v. K.W. Max Investments, Inc*., 256 F. App'x 244, 248 (11th Cir. 2007); *Casseus v. First Eagle, LLC*, No. 07-23228-CIV, 2008 WL 1782363, at *3-5 (S.D. Fla. Apr. 16, 2008) (no individual coverage to cook who "simply was not involved in any manner in the actual movement of persons or goods in interstate commerce, much less that [his] participation [in interstate commerce] was sufficiently substantial as needed to support a finding of individual coverage under the FLSA"). Because Cooper and the other Plaintiffs cannot show that they regularly engaged in interstate commerce, they are not individually covered under the FLSA.

## II.    The Dancer Plaintiffs Fail to Demonstrate they were "Employees" under the FLSA

FLSA protections apply to the dancer Plaintiffs, Dowdell, Goodine, Mathews and Sykes, only if they were "employees" under the FLSA. *Scantland v. Jeffry Knight, Inc.,* 721 F.3d 1308, 1311 (11th Cir. 2013). Independent contractors, of course, do not fall within this definition. *Id.*

The "economic realities" factors to determine if an FLSA plaintiff is an "employee" is a well-established but very fact-intensive test. The Court may consider various factors, such as (1) nature and degree of control (2) alleged employee's opportunity for profit or loss, (3) alleged employee's investment in equipment or additional personnel required, (4) skill required for the service, (5) degree and permanency of the working relationship, and (6) the extent to which the service is integral to the alleged employer's business. *Scantland.* 721 F.3d at 1312. None of these factors are outcome determinative and "the final and determinative question must be whether the total of the testing establishes the personnel are so dependent upon the business with which they are connected that they come within the protection of FLSA or are sufficiently independent to lie outside its ambit." *Usery v. Pilgrim Equip. Co.,* 527 F.2d 1308, 1311-12 (5th Cir. 1976). Overall, is the individual "in business for themselves"? *Scantland,* 721 F.3d at 1312 (citation omitted).

To be sure, cases across the country have found dancers at other, more structured clubs to be "employees" rather than independent contractors, but the question itself "is not one which allows for a simple resolution of close cases." *Usery,* 527 F.2d at 1311. This appears to be the first case in the Columbus division to address the question[1] with one also decided in the Athens division. With that backdrop, it is important that the club here is highly unorganized, with virtually no club oversight governing dancers or their conduct. While some of the points or facts may be disputed by Plaintiffs, Defendants looks mainly to the first two prongs in *Scantland:* (1) nature and degree of control and (2) opportunity for profit or loss.

---

[1]  One case previously filed in the Columbus division, *Mills v. OK Sun Adams*, No. 4:13-CV-162 (CDL), 2014 WL 1340758 (M.D. Ga. Apr. 3, 2014), did not reach a merits determination due to the defendant's bankruptcy proceeding. The Athens division case, *Burrell v. Toppers Int'l, Inc.*, No. 3:15-cv-125-CDL, 2017 WL 1395612 (M.D. Ga. Apr. 18, 2017) resulted in a finding that the dancers there were "employees" upon reconsideration only as the defendants there in effect conceded the issues and did not oppose any of plaintiff's one hundred and nine material facts. (*See* Pl.'s Mem. Supp. Mot. for Recons. of Order Den. Pl.'s Mot. for Summ. J., 3:15-cv-125-CDL, ECF No. 80-1 at 1-2.)

It is also important to note that the club's practices have become even more lax over time, particularly in 2017. Plaintiff Mathews herself put it best when describing dancing at the club:

A. It's no longer like a – I guess like a stage setting style, where there's a rotation and girls go one by one. It's not like that anymore. It's – ***I would say it's a little more on the wild side now***. So….
Q. A little more wide open, you might say?
A. Yeah.

(Mathews Dep. 43:16-22.) Indeed, two of the Plaintiffs complained that there should be *more* rules and structure at the club. (Hanson Aug. 2 Dep. 110:4-23) ("I've had a couple of the dancers – and two of them involved in this lawsuit [Mathews and Sykes] – have approached me about feeling like the place didn't have enough rules and we needed more rules and more structure … [a]s far as their ability to come and do as they want, nobody ever- I had not complaints about that.") Dancers overall "pretty much got free reign," and any "control" here is exceedingly minimal and far outweighed by the freedom and discretion that the dancer enjoys. (Hanson Aug. 2 Dep. 105:14:17.)

According to club manager Tony Hanson, dancers are able to dance whenever they wish, however they wish, and they can leave whenever they wish. (Hanson Aug. 1 Dep. 30:22-31:9, Hanson Aug. 2 Dep. 103:1-10, 104:25-105:8.) Unlike bartenders or servers who are tied to their product, dancers have always "come and go as they please," and sometimes "come in, won't be there ten minutes, and they decide not to stay. (Hanson Aug. 1 Dep. 31:3-6, Hanson Aug. 2 Dep. 103:7-10.) Dancers "dance everywhere … you'll see girls dancing wherever they want to dance." (Mathews Dep. 49:2-16.) They create their own schedule, and there is no consequence, discipline or a fine if they do not dance on that night. (Hanson Aug. 1 Dep. 33:13-34:5.)  It strains credulity for Plaintiffs to argue that they were in an "employee" position where one could come and go as they please, do the job however they wish so long as it complies with the law, charge what they

want, do the job how they want, and keep the money they earn. Can any "employee" teacher, bartender, construction worker or secretary do this?

The dancers, not the club, determine how much to quote or charge customers for dances, and the club instills no rules governing how much a dancer charges. (Hanson Aug. 2 Dep. 107:17-22; Mathews Dep. 49:11-50:25.) Dancers oversee the monitoring and tracking tips that they receive from dancing; the club is not involved in overseeing or controlling how much they receive. (Hanson Aug. 2 Dep. 107:23-108:1.) The "rules" governing dancing include an ordinance mandating that they must have their nipples covered and cannot be fully nude, and also that dancers have an ABC card. (Hanson Aug. 1 Dep. 43:18-20; Dowdell Dep. 17:24-18:1, 47:22-48:5; Goodine Dep. 29:8-17.) And while the club previously had stage rotations where if the dancer did not show, then she was just "skipped" without consequence (Hanson Aug. 1 Dep. 53:1-10; Goodine Dep. 59:6-60:9), testimony makes clear that around April or May of 2017 even that practice was dropped and dancers simply "go up [and dance] when they want to." (Hanson Aug. 1 Dep. 53:18-3, Hanson Aug. 2 Dep. 107:7-16.) Dancers are not supposed to leave out the back door, which is a request for dancers' and others' safety, and pales in comparison to the strict rules and guidelines in cases where an "employee" relationship was found. (Hanson Aug. 2 Dep. 121:15-23.) This is not a case of control tantamount to "employee" status.

While Plaintiffs will argue that there were "rules" that they were to wear attractive clothing rather than "a business suit" or sneakers, (Dowdell Dep. 48:6-15), testimony makes clear that this was not some type of *rule* but instead a recommendation from former manager Mandy Knight to increase the dancers' own profit. (Dowdell Dep. 48:6-51:18) ("I had my sneakers , and I was going on the stage, and I was told to 'put your heels on'…[she told me] Because we were dancers, we should have on heels … She just told me to change.") Indeed, it is

10

undisputed that there were no written rules for dancer conduct, and Plaintiffs' support for discipline appears to stem from disagreements with former manager Mandy Knight. (Goodine Dep. 38:2-8, 58:19-59:5; Mathews Dep. 55:18-23, 72:4-7.) While Plaintiffs will argue that dancers had mandatory "house fees" that increased depending on the hour the dancer arrived, and indeed a sign was posted briefly in the club noting this but then taken down (Mathews Dep. 134:6-136:6; Hanson Aug. 1 Dep. 42:1-14), testimony indicates however that the fees were not "mandatory" and there is no evidence that dancers would have a consequence if they were not paid. (Mathews Dep. 72:4-76:23.)  Similarly, while dancers were free, and even encouraged, to tip DJs and security and dance two weekdays in order to dance on the weekend, there is a lack of evidence that the club required dancers to do so. (Mathews Dep. 72:23-76:23.) Instead, Defendants' support for this being "mandatory" is only because management said it, and there is no evidence of punishment or consequences if it was not followed.

There is evidence that the club advertised for itself, and there is also evidence that the dancers would be able to, and did, engage in promoting of themselves "every now and again" to draw attention to themselves as performers and thereby increase their profit. (Dowdell Dep. 75:2-76:19) ("I could tell people I'm here [dancing at the club]. That doesn't mean I'm promoting this place.") This ability to take initiative for oneself is noteworthy for the independent contractor question – whether the dancers did so was entirely up to them, and how they did it was also up to them. (Mathews Dep. 84:12-87:9.) They did so using their own equipment. (Dowdell Dep. 76:20-24.)  And it cannot be said that dancers were somehow economically dependent on the club as they were able to and did dance at other locations without issue. (Mathews Dep. 21:5-23:22.)

As for the third economic realities factor, investment in equipment, the dancers pay for their own clothing, shoes (which generally cost over $150 a pair), makeup and supplies. (Mathews Dep. 54:12-55:1; Dowdell Dep. 61:4-12.) The club supplies the stages and area on which they dance. (Hanson Aug. 2 Dep. 107:7-11.) Certainly, the building itself is a greater expense that a dancer's costumes, shoes, makeup, and supplies, but it is important here that the dancer herself shares in the costs of her services and the fruits of these costs are transferable to other locations. The costs, individual labor, license, and supplies that a dancer procures for herself are material to the dancer and should be viewed likewise here as well.

Factor four, skill involved in dancing, calls an interesting question. It is true that, at the most basic level, an exotic dancer should be attractive and willing to disrobe. But to do the service effectively certainly involves a talent that most do not have. The fact that dancing does not require prior professional experience or a degree does not take away from the skill involved in being successful at the trade. Although it is a service many of us could not (or would not) perform, the unique skills involved in doing it publicly and doing it well cannot be downplayed. Here, too, the dancer's ability to increase profit depends on how she performs her services – something that Parker Promotions does not oversee, dictate or coach, and instead leaves up to the dancer herself. (Hanson Aug. 2 Dep. 105-106.) This is consistent with the concept of an independent contractor.

Regarding the fifth factor, permanency and duration of the relationship, dancers are able to dance elsewhere, and have been away from the club for long period of time, yet still are able to return and dance again without issue. (Mathews Dep. 21:5-23:22; Hanson Aug. 2 Dep. 105:24-106:5.) A long term relationship may weigh towards finding that the individual was an "employee," but Goodine states she danced at the club for just over months from late May 2016

to September 8, 2016 (Goodine Dep. 17:11-18:8), while Dowdell states she danced at the club during a span of nine months, out of which she danced only from May 23 to July 12, 2016, was away from the club, then danced September 24, 2016 to February 15, 2017 for a total of around seven months. (Dowdell Dep. 17:3-4, 33:25-35:16.) There is also evidence that individuals danced at the club for very brief periods of time on certain days. (Hanson Aug. 1 Dep. 31:3-6) ("[S]ome [dancers] leave, some leave, we don't even know when they left. I've had girls go out the back door. Some girls come in, won't be there ten minutes, and they decide not to stay.")

Perhaps the most important overall factor showing why the Plaintiff dancers were not "employees" is their general expectation, conduct, and agreement supporting the independent contractor method. They were in agreement with the situation, did not raise any questions about it until this lawsuit (Parker Dep. 143:7-16; Hanson Aug. 2 Dep. 108:25-110:8; Dowdell Dep. 70:9-11; Goodine Dep. 49:25-50:9; Mathews Dep. 111:6-112:7.) And under this pay agreement they were able to obtain the payment without a *true* employer reporting their income, with three of the Plaintiffs not reporting their income. (Dowdell Dep. 60:3-10; Goodine Dep. 54:1-14; Sykes Dep. 36:18-37:24.)

So while Plaintiffs will string-cite cases involving a contrary result at other clubs throughout the nation, that number of opinions is not relevant compared to the underlying merits of the respective decisions and the facts here. Defendants stress the extremely minimal oversight, structure, and organization of the club here, and point to the more recent opinion in *Tijerino v. Stetson Desert Project LLC*, 2017 WL 9511247 (D. Ariz. June 21, 2017). *Tijerino* was appealed to the Ninth Circuit (No. 18-16013) and has not been decided at the appellate level as of this filing. *Tijerino* involved the same question of whether a dancer was an independent contractor or not, and that court noted that, in cases finding for the dancers, "the clubs were found to exert

'substantial,' 'significant,' 'high,' or a 'tight' amount of control over their dancers." *Id.* at *2. In finding for independent contractor status, the court stressed that the dancers have "overwhelming autonomy, and that the Club exerts minimal control over them." *Id.* at *5. While the court found that some of the economic reality factors weighed for independent contractor and some weighed against it, ultimately it held in favor of independent contractor, where the club exerted "virtually no control over their dancers," like here, under the first economic reality factor. *Id.* at *8.

The lack of oversight and control at Club Fetish is noteworthy – so much that Mathews and Sykes complained that there should be *more rules and more oversight.* (Hanson Aug. 2 Dep. 110:4-23.) That is a stark contrast to cases Plaintiffs may cite.  This case is more like *Tijerino* than, for instance, *Clincy v. Galaradi S. Ent.,* 808 F. Supp. 2d 1326, 1330-35 (N.D. Ga. 2011), where the club required dancers to agree to rules and conduct, drug tests, various meetings to discuss the club's rules, policies, decorations and furnishings, had a check-out process with a breathalyzer test, and provides written "notices of corrective action" to dancers in violation collected on the night imposed (including, for instance, bringing in food) – all factors noticeably absent here. *Cf. Matson v. 7455, Inc.*, No. 98-788, 2000 WL 1132110, at *2-4 (D. Or. Jan. 14, 2000) (dancer was not "employee") and *Hilborn v. Prime Time Club, Inc*., No. 11-00197, 2012 WL 9187581, at *1-2 (E.D. Ark. July 12, 2012) (same). For these reasons and under the limited facts of this case, the Court should grant summary judgment on independent contractor classification and find that the Plaintiff dancers were independent contractors.

## III.    Nicholas Parker is not an "Employer" Under the FLSA

To qualify as an "employer" under the FLSA, "an individual officer must either be involved in the day-to-day operation or have some direct responsibility for the supervision of the employee." *Patel v. Wargo,* 803 F.2d 632, 638 (11th Cir. 1986). *See also Alvarez Perez v.*

14

*Sanford-Orlando Kennel Club, Inc.*, 515 F.3d 1150, 1160 (11th Cir. 2008); *Stevenson v. Great American Dream, Inc.*, No. 1:12-CV-3359-TWT, 2015 WL 2353094, *1-2 (N.D. Ga. May 15, 2015) (no individual liability for adult nightclub president who deferred to club managers). In this regard, the issue is not whether Parker *could* have played a larger role at the club as owner, but instead *did he exercise* operational control through his involvement in the day-to-day operation of the club and "have some direct responsibility for the supervision of the employee." *Patel*, 803 F.2d at 638; *Olivas v. A Little Havana Check Cash, Inc.,* 324 F. App'x 839, 845-46 (11th Cir. 2009) ("a reasonable person could conclude that Mrs. Rodriguez was in charge of day-to-day operations and exercised direct supervision of the employees, particularly when Mr. Rodriguez was out of the country, so as to establish "employer" status).

The undisputed facts make clear that other individuals managed the club, and that Parker delegated any authority he had to these managers. Parker spoke to the club's managers very little or "[n]ot very often." (Parker Dep. 39:1-18.) Overall, Parker has had virtually no role at the club outside of owner, "other than picking up money." (Parker Dep. 41:21-23.) He "could only be considered 'involved' … by virtue of his indirect delegation of authority to others to handle them." *Santos v. Cuba Tropical, Inc.*, 829 F.Supp.2d 1304, 1312-13 (S.D. Fla. 2011).

Plaintiffs and others at the club were very unfamiliar with Mr. Parker. (Hanson Aug. 2 Dep. 85-87 ("Q. How do the dancers know who Nick Parker is? A. A lot of them don't.") And while an alleged employee's familiarity with a business owner is not a binding factor, it rebuts and weighs against any argument that Parker *exercised* operational control of the club to the level of arguably being an FLSA "employer." *Santos*, 829 F.Supp.2d at 1312-13 (rejecting argument that co-owner was "employer" where he "could only be considered 'involved' in

[employment-related] matters by virtue of his indirect delegation of authority to others to handle them" ).

Specifically, Goodine never saw Parker, talked to him, or discussed her dancing with him. (Goodine Dep. 33:25-34:11.) Sykes met Parker at the club, but had no employment related dealings with him. (Sykes Dep. 36:4-13.) Dowdell was also unfamiliar with him, and could offer no testimony about him at all save for a time manager Tony Hanson called him regarding her ABC card after another manager, Mandy Knight, allegedly "suspended" her for not paying a house fee. (Dowdell Dep. 40:12-20.) Other than that this phone call occurred, Dowdell knew nothing about what Parker said or did as a result of the phone call, only that Hanson called him. (Dowdell Dep. 41:25-44:7.) Cooper is unable to offer any evidence about Parker being involved in hiring, firing, or disciplining individuals at the club. (Cooper Dep. 119:12-120:6.)

Although Plaintiffs may argue that Parker was the head of the "chain of command," this certainly does not demonstrate that Parker was "involved in the day-to-day operation" to bring about FLSA liability. Nor does it show that Parker had "direct responsibility for the supervision of the employee." The Eleventh Circuit clearly holds that "unexercised authority is insufficient to establish liability as an employer." *Alvarez Perez,* 515 F.3d at 1161. Plaintiffs' evidence in this regard is minimal. Plaintiffs point to a sign that was posted briefly in the club that listed dancer's house fees and said, at the bottom, "per Nick Parker," allegedly posted February 2017. (Hanson Aug. 1 Dep. 42:1-22; Dowdell 82:23-83:1.) However, testimony indicated that he saw the sign when he went to the club to review a leak, "asked who put up that sign, Tony said he did, I said, well remove the sign." (Parker Dep. 62:12-16.) He requested that the sign be removed "[f]or the simple fact that it said per Nick Parker, and I did not say that." (Parker Dep 62:17-19.)  The sign was removed "immediately." (Hanson Aug. 1 Dep. 42:14.)

Mathews had a benign conversation with Parker involving an argument she had with manager Hanson about an ABC card, and Parker "defused the situation" and got her to calm down. (Mathews Dep. 37:25-39:16, 114:16-20.) She testified that management told her to not come back after leaving out the back door too many times, and she was away from the club for several months. (Mathews Dep. 105:8-108:18.) After several months she "reached out to Nick," apologized and indicated she wanted to go back to the club. (Mathews Dep. 110:1-20.) But Parker told Mathews that she "should speak with the manager," who continued to "push [her] back," tell her it was "up to Nick" who then told her "it was [up to] the manager." (Mathews Dep. 115:1-13.) Ultimately, it was "frowned upon" if workers ever attempted to contact Parker, because the management instead was there to handle club issues and personnel matters. (Cooper Dep. 79:20-80:2.)

This account makes clear that it was the managers (Tony and Mandy) exercising direct supervision over the employees, and shows Parker's distance where Mathews "reached out" to him for this one time conversation after being away several months. Certainly, if a TBS or CNN employee "reached out" to Ted Turner about an issue, this would not have made him individually liable under the FLSA for company decisions. This testimony does not rebut the evidence that Parker's company involvement was strictly financial as far as maintain the club itself, as in "about a bill, or to pay a liquor bill … how's the money going to come to get it paid," and not supervisory or compensation decisions. (Parker Dep. 63:3-17; Hanson Aug. 1 Dep. 55:14-23.)

Plaintiffs repeatedly testified to their involvement with managers Mandy Knight primarily and also Tony Hansen. (Statement of Material Facts ¶¶ 22-23.) In fact, manager Tony Hanson testified that he was the one with oversight for the club as to FLSA. (Hanson Aug. 1

Dep. 24:21-24.)   There is no evidence that Parker maintained employment records, instead, company taxes and documents were handled by Mandy Knight and now manager Tony Hanson. (Parker Dep. 33:10-16, 41:19-20.) Because the undisputed evidence shows that Parker was not an FLSA "employer," he should be granted summary judgment individually.

## IV.    Plaintiffs Cannot Prove "Willfulness" by Defendants

While the FLSA statute of limitations is generally two years, that statute can be extended to three years for a "cause of action arising out of a willful violation" of the FLSA. 29 U.S.C. § 255(a). *Stevenson,* 2015 WL 2353094, at *2-3 ("given the amorphous nature of the term 'employee,' the Court is reluctant to conclude that [defendant's] belief – that the entertainer's were not 'employees' under the FLSA – was objectively unreasonable"). Plaintiffs carry the burden of demonstrating, by a preponderance of the evidence, that the employer acted willfully, and a violation is "willful" if "the employer either knew of showed reckless disregard for the matter of whether its conduct was prohibited" under the FLSA. *Allen v. Board of Pub. Educ. For Bibb Cty.*, 495 F.3d 1306, 1323-24 (11th Cir. 2007). Additionally, plaintiffs "who prevail under the FLSA are entitled to recover liquidated damages unless the employer makes an affirmative showing that it acted in good faith." *Ojeda-Sanchez v. Bland Farms, LLC*, 499 F. App'x 897, 902 (11th Cir. 2012). These issues generally ride in tandem. *Alvarez Perez*, 515 F.3d at 1163.

Of course, as summary judgment should be granted to Defendants for lack of FLSA coverage for the three years preceding the Plaintiffs' May 30, 2017 Complaint, this is mainly a moot point as to the statute of limitations. But it is important because it could also lead to liquidated damages under the FLSA. Plaintiffs' evidence does not show that Parker Promotions willfully violated the FLSA. As set forth above, there is considerable question as to even the FLSA's application to Parker Promotions at all. And to date, there appears to be no contested

case in the Middle District of Georgia finding that dancers, similar to Plaintiffs, were employees under the FLSA.[2] There has also not been a binding Eleventh Circuit merits decision ruling on the issue either way. And it is undisputed that Parker and his management were not familiar with similar cases filed in other areas, and that the club was operated the same way as other club where there was no known issue or conflict. (Parker Dep. 140:10-141:1; Hanson Aug. 1 Dep. 24:16-20, Hanson Aug. 2 Dep. 108:25-110:3; *see also* Mathews Dep. 18:3-21 (testifying she was paid for dancing at the Cat Walk in Columbus not by an hourly wage but instead by tips.))

Moreover, a U.S. Department of Labor representative spoke to Parker in 2015, who informed him of the independent contractor dancers, and told Parker that he was not interested in the independent contractors and that "everything was OK." (Parker Dep. 15:17-16:15.) None of the Plaintiffs (or anyone else) themselves raised any issue about classification. (Dowdell Dep. 70:9-11; Goodine Dep. 49:25-50:9; Mathews Dep. 111:6-112:7.) And Plaintiffs' testimony shows they lack any evidence that any alleged violation here was "willful" or "intentional." (Dowdell Dep. 69:3-70:7; Goodine Dep. 48:10-22; Mathews Dep. 112:8-113:5.) Under these facts, summary judgment should be granted for Defendants on willfulness and good faith.

## V.    Goodine Abandons her Overtime Claim

Summary judgment must be granted as to count VIII of Plaintiffs' Complaint, which is Goodine's overtime claim. Goodine clearly testified that she does not claim to have worked over 40 hours a week. (Goodine Dep. 41:5-1. ("Q. And your best recollection sitting here today is that you would work about 30 hours [at the club], you'd spend about 30 hours there a week. A. Correct. … Q. So you're not making any claim for overtime pay. You're not saying that you should've gotten paid overtime. A. No. Q. What do you understand your – your claim in this

---

[2] As noted above, an Athens division case holding for dancers was not contested. *Burrell v. Toppers Int'l, Inc.*, No. 3:15-cv-125-CDL, 2017 WL 13956612 (M.D. Ga. Apr. 18, 2017)

case to be? A. Getting paid for the hours that I worked by minimum wage.") Therefore she has no overtime claim under the FLSA. 29 U.S.C. § 216(b).

## VI.     Cooper Fails to Demonstrate His Overtime Compensability Timeframe for 2017

Cooper fails to create a genuine issue of material fact for entitlement to overtime payment and summary judgment should be granted on his overtime claim as he cannot demonstrate what year he alleges he worked overtime. In other words, as summary judgment must be granted against Cooper for the years 2014, 2015, and 2016 for a lack of FLSA coverage, and Cooper cannot rule out that his alleged overtime ended in 2016 – he just does not know – summary judgment is warranted. He based the conclusion of his overtime allegations on when he last worked late with Mandy as his manager (Cooper Dep. 56:21-57:9), but clearly could not state if that was in 2017, or in 2016. (Cooper Dep. 73:9-22.) Because he cannot show when this occurred (and there is no FLSA coverage for 2016), he does not meet his burden to show an FLSA violation for 2017 under 29 U.S.C. § 207(a) and summary judgment must be granted on his claim.

## CONCLUSION

For the reasons set forth herein, Defendants Parker Promotions and Nicholas Parker move this Court to grant summary judgment and dismiss Plaintiffs' lawsuit with prejudice.

(Signature on following page)

20

Respectfully submitted, this 21st day of November, 2018.

**WALDREP, MULLIN & CALLAHAN, LLC**

/s/David R. Helmick
David R. Helmick
Georgia Bar No. 344210
C. Morris Mullin
Georgia Bar No. 528550
Attorneys for Defendants

111 Twelfth Street, Suite 300
PO Box 351
Columbus, Georgia 31901
(706) 320-0600
(706) 320-0622 (fax)
dhelmick@waldrepmullin.com

## CERTIFICATE OF SERVICE

I do hereby certify that on November 21st, 2018, I filed a copy of the foregoing on

CM/ECF to serve all parties so entered in the case.

/s/David R. Helmick
David R. Helmick, Esq.
Attorney for Defendants

111 Twelfth Street, Suite 300
PO Box 351
Columbus, Georgia 31901
(706) 320-0600
(706) 320-0622 (fax)
dhelmick@waldrepmullin.com